FILED

MAR 1 2 2007

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | \* | CR. 06-40125 |
| Plaintiff, | \* | |
| vs. | \* | REPORT and RECOMMENDATION |
| | \* | (Motion to Suppress) |
| PEDRO IBARRA, | \* | |
| Defendant. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pending is Defendant's Motion to Suppress Evidence (Doc. 29). A hearing was held on Thursday, February 22, 2007. Defendant was personally present and represented by his counsel of record, Mr. Patrick Schroeder. The Government was represented by Assistant United States Attorney, Mr. John Haak. Sioux Falls Police Officers Alex Ellman and Adam Hanisch testified at the hearing. Additionally, both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all of the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be **DENIED.**

## JURISDICTION

Defendant is charged in an Indictment with Possession with Intent to Distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). The pending Motion to Suppress was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated November 29, 2006.

## FACTUAL BACKGROUND

Sioux Falls Police Officers Alex Ellman and Adam Hanisch, along with Hanisch's partner, Officer Cook, were on patrol duty on December 6, 2006, when they responded to a call regarding possible narcotics activity at a trailer house at 4506 W. 12th Street Trailer # 31, at 1:05 p.m. TR 4-5. Officers Ellman and Hanisch approached the front door. TR 5. Officer Cook approached the rear door. TR 5. Officer Ellman knocked on the front door. Music and movement could be heard from within the trailer. TR 6. After about one minute, someone (later determined to be Mr. Ibarra) answered. TR 6. The officers explained they would like to step in to talk with Mr. Ibarra. He

agreed. TR 6-7. Officer Ellman clarified that it would be o.k. for the officers to enter, motioning toward the inside, and Mr. Ibarra again agreed to allow the officers inside. TR 7. The officers had not yet indicated why they were there. Officer Ellman stated he asked for and received permission a total of three times before the officers entered the home. TR 7. Officer Ellman noted Mr. Ibarra had a Hispanic accent--which was part of the reason Officer Ellman clarified permission to enter. TR 8. Officer Ellman testified Mr. Ibarra appeared to understand what he was saying. TR 7, 15. Officer Ellman testified that it is his personal practice to clarify several times that he has permission to enter a person's home, regardless of any language barriers. TR 15.  When the officers obtained permission to enter, they notified Officer Cook (who had been at the back door of the trailer) and he joined them in the trailer. TR 20, 26.

Mr. Ibarra gestured with his hand, turned to his left, and led the officers into the trailer. TR 8. The officers observed two other men and one woman in the living room, and they could hear others in the back bedroom. TR 9. The officers observed that the people in the trailer had been drinking beer. TR 14-15. The officers asked whether other people were in the back, and Mr. Ibarra confirmed there were and gestured toward the back of the trailer. TR 9. When the officers initially obtained Mr. Ibarra's permission to enter, they did not  inform him they would be walking throughout the trailer to speak with all the occupants. TR 20-21.

Officer Ellman went to the back of the trailer, where three women  were found in a back bedroom sitting on a mattress on the floor. TR 10   Other than the officers, there were a total of seven people in the trailer (four in the front room, and the three women  in the back bedroom). TR 9. Officer Hanisch remained in the front room and requested identification from the people there. TR 22-23.  One of the people in the front room could not produce a valid identification and could not provide a social security number. TR 23. Officer Hanisch suspected that person probably had immigration issues. Id. Officer Hanisch informed the persons in the front room the police had been summoned because of possible narcotics violations and minors in the trailer. TR 24. One of the persons asked who called in the complaint; Officer Hanisch explained he did not know that information, but it could have been any one of the neighbors, because the stereo was playing so loud the whole trailer park could hear it. TR 24. Officer Hanisch partook in small talk with the persons in the front room while waiting for dispatch to come back with warrant information. TR 24.  Officer Hanisch explained it appeared two of the male individuals had been drinking, but Mr. Ibarra had not.

TR 15, 30.  No blood alcohol tests were performed.  TR 31.  Officer Hanisch did not request the assistance of an interpreter, although he has requested assistance in the past.  TR 31.  Officer Hanisch did not perceive a communication difficulty with Mr. Ibarra.  TR 32

Officer Ellman stated he went to the back of the trailer as "part of his normal security sweep."  TR 10.  He did not ask permission to go to the back of the trailer.  TR 16.  He stated he wanted to identify the persons in the back of the trailer for officer safety purposes.  TR 16.  Officer Hanisch explained that when they enter a home they need to identify everybody because they "need to have everybody accounted for, so there is nobody hiding in the back rooms or we can't be surprised with somebody walking out with a gun or a weapon or charging us . . . we need to know that everybody is accounted for and there is no weapons involved."  TR 29.

Officer Ellman was in the back bedroom of the trailer for between five or ten minutes determining the identity of the persons who were there.   TR 16-17.  Officer Ellman stated "no particular reason" he did not call for the people in the back room to come to the front, rather than walking to the back to speak with them.   TR 16.  He did not take the women out to his patrol car to speak with him, because he did no believe that was a safe option, given the number of people and the number of officers present at the scene.[1]  TR 18-19.  Officer Hanisch also stated he did not believe it was safe to take Mr. Ibarra outside to talk given the number of people and officers at the scene.  TR 29.

Officer Ellman spoke to the women in the back bedroom.  It was his understanding they were visiting Mr. Ibarra, who resided  at the trailer.  TR 10-11, 18.  He explained why the officers were there, and asked whether any narcotics activities were occurring.  TR 11.  In the course of identifying the women, it was discovered that one of  them  had  an active warrant and she was taken into custody.  TR 11.  One of the other women ("Rebecca") who had been sitting next to the woman with the warrant  motioned for Officer Ellman that she wanted to speak to him in another room.  TR 11.  She spoke very softly and Officer Ellman had difficulty understanding what she was trying to convey.  Officer Ellman followed the woman into the other room, where she pointed toward a closet/dresser area.  The officers had earlier heard noises coming from the room, and Officer Ellman believed the

---

[1]There were initially three officers at the scene.  Officer Ellman explained that he arrived solo in his patrol car, while Officers Hanisch and Cook arrived together in their patrol car. Another officer was summoned to the scene later.  TR 19.

woman was trying to tell him someone was hiding in the closet. He instructed "Rebecca" to get out of the room, and ordered the person he believed to be hiding to get out of the closet. Nobody came out. He looked in the closet and found no-one. TR 11-12. Officer Ellman went back to the back bedroom to again try to determine what "Rebecca" was trying to tell him. She went back to the other room and again motioned to the closet/dresser area. Officer Ellman instructed her to speak louder so he could hear her, and asked what she was pointing to. She said "over there on the dresser." Officer Ellman looked again and saw a plate with a white, powdery substance on it sitting on the dresser. Officer Ellman asked "Rebecca" what it was and she said "drugs." TR 12-13. Officer Ellman requested a test kit from the other officers who were present to test the possible drugs. TR 13. The test was positive for methamphetamine. TR 26-27.

After the substance tested positive for drugs, another Officer who had arrived at the scene (Henkle) asked Mr. Ibarra for permission to search the rest of the trailer for more narcotics. Mr. Ibarra said "yes." TR 27-28. Officer Hanisch has been a police officer for eight years, and has never had a suspect give permission for a further search after drugs have been found in a residence. TR 28. Because he thought it was so unusual for permission to be given, he asked Mr. Ibarra again if he was giving permission for a further search. TR 28. Mr. Ibarra again gave permission for a further search. He was not yet under arrest at the time. TR 33. He was standing in his kitchen, talking with the officers. TR 33. Officer Hanisch insisted his confirmation of Mr. Ibarra's permission had nothing to do with a language barrier. TR 32.

The parties stipulated that after the events at the trailer, Mr. Ibarra was taken into custody, advised of his *Miranda* rights, agreed to waive those rights and gave a statement to law enforcement officers. TR 34-35. He now moves to suppress all evidence seized and all statements given by him on December 6, 2006.

## DISCUSSION

### Burden of Proof

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, United States v. Phillips, 540 F.2d 319 (8th Cir.1976) cert. denied, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976), but on the government to justify a warrantless search or seizure. United States v. Bruton, 647 F.2d 818 (8th Cir.1981) cert. denied, 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981). The standard of proof is a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477,

4

92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The burden is on the Government to prove that consent to search is "freely and voluntarily given." United States v. McIntosh, 857 F.2d 466, 467-68 (8th Cir. 1988) (citations omitted).

### Voluntariness of Consent--The Language Barrier

A consensual search does not violate the Fourth Amendment if the consent was given voluntarily and without coercion. United States v. Meza-Gonzalez, 394 F.3d 587, 592 (8th Cir. 2005). The standard is objective reasonableness, gauged by what the typical person would have understood from the exchange with the officer. Id. The Court should examine the totality of the circumstances to determine whether consent is given voluntarily, including the nature of the encounter and the characteristics of the consenting party. If the law enforcement officers reasonably believed the defendant consented voluntarily, the search is lawful under the Fourth Amendment. United States v. Contreras, 372 F.3d 974, 977 (8th Cir. 2004).

Mr. Ibarra challenges the voluntariness of the consent he gave (1) to enter the trailer and (2) to search the trailer on the basis of the language barrier between himself and the officers. Mr. Ibarra's first language is Spanish and he has used the services of an interpreter for all proceedings before this Court. Neither party has presented any authority, however, and the Court has found none that indicates the use of an interpreter for later court proceedings mandates a finding that an earlier consent or waiver of rights without an interpreter was invalid.

Both officer Ellman and Officer Hanisch testified that they conversed in English with Mr. Ibarra and that although he had a Hispanic accent, he responded appropriately and appeared to understand them. Neither the officers nor Mr. Ibarra requested the services of an interpreter at the scene. There was no evidence presented that Mr. Ibarra ever indicated an inability to understand what was happening or what the officers were saying/asking. No testimony other than the officers (who said Mr. Ibarra appeared to understand English) was presented. That Defendant understood and appropriately answered the questions put to him in English causes me to conclude his English skills were sufficient for a valid consent. United States v. Carrate, 122 F.3d 666, 670 (8th Cir. 1997). See also United States v. Perez, 200 F.3d 576 (8th Cir. 2000) (consent to search voluntary although English not defendant's first language); Campaneria v. Reid, 891 F.2d 1014 (2nd Cir. 1989) (waiver of Miranda knowing and intelligent even though defendant spoke "broken" English and lapsed into Spanish during conversation with officers); United States v. Alcarez-Mora, 246 F.Supp.2d 1146, 1152

(D. Kansas 2003) (noting defendant's basic ability to understand and communicate in English and finding consent to search/waiver of rights voluntary; gathering cases).

### Voluntariness of Consent–Misrepresentation

Misrepresentations about the nature of an investigation may be evidence of coercion. In addition, misrepresentations can invalidate consent to search if the consent is given in reliance on the misrepresentation. United States v. Turpin, 707 F.2d 332, 334-35 (8th Cir. 1983). In his brief, Mr. Ibarra suggests the officers gained his consent to enter through misrepresentation. Specifically, he asserts the officers said they wanted to speak with him about a noise complaint. Both officers testified at the hearing, however, that Mr. Ibarra gave his consent for the officers to enter before they stated the purpose for their presence. Officer Hanisch testified that once inside, he told Mr. Ibarra there had been a call from a neighbor concerned about minors in the trailer with narcotics activity going on, and upon inquiry stated that any one of the neighbors could have complained, because the stereo (which he asked Mr. Ibarra to turn down) could be heard throughout the trailer park. The consent to search, however, was requested only after drugs had been found in the trailer and was requested as a direct result of that discovery. There was no evidence that these facts were concealed from Mr. Ibarra–to the contrary the officers told him the reason they were requesting permission to search was that drugs had been found. Again, no contrary testimony or evidence was presented. There is insufficient evidence that the officers made misrepresentations which would render Mr. Ibarra's consent involuntary under the totality of the circumstances.

### Scope of Consent to Enter–"Protective Sweep"

Mr. Ibarra asserts the evidence discovered in his home and his later self-incriminating statements should be suppressed because it is all "fruit of the poisonous tree." He argues the officers exceeded the scope of his consent to enter his home when they conducted a "protective sweep" which revealed drugs, and led to a more extensive search and to Mr. Ibarra's self-incriminating statements.

The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene. Maryland v. Buie, 494 U.S. 325, 337, 110 S.Ct. 1093, 1099-1100, 108 L.Ed.2d 276 (1990). The Eighth Circuit has explained that a sweep search is not permissible "when officers [are] not properly within the home to execute a search warrant or for some other legitimate purpose." United

6

States v. McIntosh, 857 F.2d 466, 469 (8th Cir. 1988). In McIntosh, the Court held the defendant's rights were violated because the police "entered the home without a warrant, consent or exigent circumstances and seized his personal property." Id. The Eighth Circuit has declined to extend the protective sweep doctrine to include a non-arrest situation when there was no showing that the officers had a reasonable suspicion any other dangerous persons may be in the house. United States v. Waldner, 425 F.3d 514, 517 (8th Cir. 2005). A protective sweep is allowable in the absence of an arrest warrant, however, if the officers enter with permission and are confronted with probable cause and exigent circumstance ( see United States v. Jansen, 470 F.3d 762, 765 (8th Cir. 2006); or when there is an arrest, but the arrest and and the protective sweep are out of order (see United States v. Turbyfill, 525 F.2d 57, 59 (8th Cir. 1975) (noting, "in this case no one was under arrest when Officer Harmon proceeded to the basement. However, the distinction is not significant. . . .[the officers] had probable cause to believe a crime was being committed in their presence and that [the defendant] might have been the person committing it. There is no reason in such a situation for requiring police officers to formally arrest a suspect before checking the premises for other persons.").

Mr. Ibarra does not dispute that one of his guests had a warrant outstanding for her arrest. He has no standing to assert a constitutional violation on the arrestee's behalf. Nor does he dispute that once she was identified and arrested, the officers were entitled to conduct a protective sweep *if* the searching officer possessed a reasonable belief based on specific and articulable facts that the area to be swept harbored an individual posing a danger to those on the arrest scene. Maryland v. Buie, 494 U.S. 325, 337, 110 S.Ct. 1093, 1099-1100, 108 L.Ed.2d 276 (1990). Mr. Ibarra likewise does not dispute that the drugs were in plain sight in one of the back bedrooms. In this instance, however, the officers did not offer specific and articulable facts that the area to be swept harbored dangerous persons. They merely stated that they conducted the protective sweep as a matter of routine, to make sure they had identified all persons present in the trailer and to assure none of them were armed. Here, the officers conducted the protective sweep in a non-arrest situation (i.e. the sweep occurred before they had any inkling the guest would be arrested on an outstanding warrant). According to Waldner, in order to justify the protective sweep, the officers must make a showing of *reasonable suspicion of dangerous individuals in the house.* Waldner, 425 F.3d at 517. This they did not do. The officers, while understandably concerned about their safety in a small trailer with several people who had been drinking, did not articulate any particular suspicion that the trailer harbored any armed

7

or dangerous persons, or any other reason that they needed to conduct a protective sweep of the entire trailer once they entered the front door pursuant to Mr. Ibarra's consent. This Court is limited by the rule set by the Eighth Circuit in Waldner which has declined to extend Buie. The evidence and statements obtained from Mr. Ibarra cannot be sustained based solely on the protective sweep doctrine.

**Inevitable Discovery**

The inevitable discovery doctrine provides that if the prosecution can establish by a preponderance that the information to be otherwise suppressed under the exclusionary rule ultimately or inevitably would have been discovered by other means, the exclusionary rule does not apply. United States v. James, 353 F.3d 606, 616 (8th Cir. 2003). The prosecution must show (1) there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct; and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation. Id. In applying the inevitable discovery doctrine, it is important to focus not on what the officers actually did after they unlawfully discovered evidence, but rather on what they were reasonably likely to have done had the unlawful discovery not occurred. United States v. Villaba-Alvarado, 345 F.3d 1007, 1020 (8th Cir. 2003). This inquiry "necessarily entails reasoning about hypothetical circumstances contrary to fact." Id.

Mr. Ibarra did not consent to Officers Ellman and Hanisch traversing through his entire home when he allowed them in his front door. It was not, however, the "protective sweep" which led to the discovery of the methamphetamine on the plate in the back bedroom. Rather, it was the tip from one of Mr. Ibarra's guests which caused Officer Ellman to look for the drugs. The tip came after one of the other guests had been taken into custody because she had an outstanding arrest warrant. Officer Ellman went to the back bedroom to speak with the woman who had the warrant, but did not locate the drugs during the course of identifying her. The drugs were found as a result of the tip from the informant. Constitutional rights are personal and cannot be asserted vicariously. United States v. Bruton, 416 F.3d 310, 312 (8th Cir. 1969). Mr. Ibarra has no privacy interest in statements which may tend to incriminate him made by a third party, and therefore has no standing to assert a Fourth Amendment violation regarding the manner in which the *statements* were obtained. United States v. Rodriguez-Arreola, 270 F.3d 611, 616 (8th Cir. 2001).

The Tenth Circuit, like the Eighth Circuit, has been hesitant to extend the circumstances in

8

which protective sweeps are permitted. See United States v. Torres-Castro, 470 F.3d 992, 996 (10th Cir. 2006). In Torres-Castro, the Tenth Circuit declined to extend the protective sweep doctrine to include consensual "knock and talk" police encounters like the one which occurred at Mr. Ibarra's trailer on December 6, 2006. The Tenth Circuit noted, however that like Eighth Circuit precedent "a search may precede an arrest and still be incident to that arrest . . .[w]here the formal arrest followed quickly on the heels of the challenged search it is not particularly important that the search preceded the arrest rather than vice versa." Id. at 997 (citation omitted, punctuation altered). In Torres-Castro, the Court found that although the defendant was not arrested until after the protective sweep, they knew before they entered that he may be armed, and when they arrived, several other people (who ran to the back of the home) were present. The officers did not know their identities. "We think a reasonable officer would take precautions to make sure that no hidden threat was lurking in the house." Id. at 998-99. Nevertheless, the case was not decided on the basis of the protective sweep doctrine, because the Court found that the evidence would have been inevitably discovered. Specifically, "while there may have been a factual nexus between the protective sweep and the discovery of the shotgun shells, it is apparent . . . that the shells would have inevitably been discovered and accordingly, should not be subject to suppression." The Court found the evidence would have been inevitably discovered because Mr. Torres-Castro "voluntarily admitted" the officers into his home, statements from his girlfriend gave them a "strong objective basis" to ask about the presence of illegal items and request permission to search, and having seen several people moving toward the back of the house, "a reasonable officer would have asked the same questions and made the same request regardless of the protective sweep." Torres-Castro, 470 F.3d at 1000.

Similarly, in this instance, Mr. Ibarra voluntarily admitted Officers Ellman and Hanisch into his home. They were there to investigate the possibility of illegal narcotics activity. The officers would have inevitably identified the guests in Mr. Ibarra's home–whether the guests were called to the front room or whether the officers went to the back room to identify them. The drugs were not seen by Officer Ellman during the "protective sweep" but rather were brought to his attention by one of the guests after it was discovered that there was an outstanding arrest warrant for another guest. Based on this information, Officers Henkle and Hanisch asked Mr. Ibarra for permission to search–which he gave. As in Torres-Castro, the Government has made a sufficient showing that "a reasonable officer would have asked the same questions and made the same request regardless of the

9

protective sweep." Torres-Castro, 470 F.3d at 1000.

## CONCLUSION

The Government has carried its burden to show that Mr. Ibarra's consent to enter his home and his later consent to search were freely and voluntarily given. Although the officers were properly in Mr. Ibarra's home, and a person in the home was arrested, the officers  did not sufficiently articulate a reasonable belief based on specific facts  that the area to be swept (the back bedroom) harbored a person or persons posing a danger to those on the scene.  The evidence and statements from Mr. Ibarra would have nevertheless been inevitably discovered, however, because the officers would have determined the identify of Mr. Ibarra's house guests regardless of whether they called the guests to the front room or talked with them in the back room.  Once it was discovered one guest had an outstanding warrant, another guest decided to reveal the presence of illegal drugs in the house.  Mr. Ibarra has no privacy interest in incriminating information which another person may choose to reveal.  It was that information –not the protective sweep--which led the officers to request his permission to search the trailer.  It is therefore respectfully **RECOMMENDED** to the District Court that Defendant Ibarra's motion to suppress be **DENIED**.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990)
Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

.

Dated this 12th day of March, 2007.

BY THE COURT:

John E.  Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk

By Jackie Meisenheimer

(SEAL)

11